In re T.H. RICHARDS PROCESSING
COMPANY, Debtor.  (Three Cases)

ALVERNAZ FARMS, INC.; Dennis Bas-
tiao, doing business as Bastiao Farms;
Robert Borchard & Sons; Dettling
Farms, Inc., Richard Dettling, Gary
Dettling; Mike Dresick, doing business
as D & H Farms, Inc.; Fred & Lloyd
Durst, doing business as Durst Bros.;
Galindo Farms; Holdener Farms, Inc.;
Edgar Jane Farms, Inc.; J & R

Kalsfbeek, Inc.; Denny Kidwell; Ard K. Kozono; Matsumura, Inc.; George Morita, Nishikawa Farms, Inc., Rosa Farms, Williams Schoeningh, Hiroshi Tabata, M. Wilbur, Jr., Yosh Yamato, dba Yamco Farms, Newhall Land & Farming Co., Plaintiffs–Appellants,

v.

BANK OF CALIFORNIA,
Defendant–Appellee.

Lloyd M. RIVES; Thomas C. Howe; John Goelet, as administrators with the will annexed of the Estate of Whitney Warren, Deceased, Plaintiffs–Appellants,

v.

HARRIS TRUST AND SAVINGS BANK; Security Pacific National Bank; Bank of California, Defendants–Appellees.

CALIFORNIA CANNING PEAR ASSOCIATION; All State Packers, Inc.; California Bartlett Packers; A. Russell Gallaway, Jr.; G.C. Johnson & Sons; Ard K. Kozono; Naumes, Inc.; Runyon & Dorsey Orchards, Salisbury & Johnson, Scott's Valley Fruit Exchange, Fong Shee & Sons, Lloyd M. Rives, Thomas C. Howe and John Goelet, as administrators with the will annexed of the Estate of Whitney Warren, Deceased, Plaintiffs–Appellants,

v.

HARRIS TRUST AND SAVINGS BANK; Security Pacific National Bank; Bank of California, Defendants–Appellees.

Nos. 88–15318 to 88–15320.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1989.

Decided Aug. 8, 1990.

O'SCANNLAIN, Circuit Judge:

In this complex bankruptcy case, we examine the intricacies of California's agricultural producer's lien. The crucial question is whether a grower, merely by agreeing with a processor to a deferred payment for its produce, releases its lien as a matter of law. We conclude that such lien is not so released, and we therefore reverse the order of the district court which concluded otherwise.

I

Appellants are farmers (collectively hereinafter "Growers"). Twenty-three of them grow tomatoes; twelve grow pears; and one, in the past, grew peaches.[1]

In 1981, all of the tomato growers (with one exception) signed identical individual contracts with T.H. Richards Processing Co. ("THR") to sell THR their produce. The contracts provided that THR would pay fifty percent of the contractually agreed-upon price within one week of delivery of the produce and fifty percent one year after delivery, without interest.

Each tomato contract contained a section entitled "Release of Producer's Lien," which purported to effect a release of the growers' statutory liens which arise under California law. *See generally* Cal.Food & Agric.Code §§ 55631–55653 (West 1986 & Supp.1990). Only one tomato grower, Newhall Land and Farming Co. ("Newhall"), declined the contract with the release section; its representative crossed that section out before signing. Newhall's contract with THR was otherwise identical to the other tomato growers'.

Of the twelve appellant pear growers, ten are members of the California Canning Pear Association ("Pear Association" or "Association"). The Pear Association, a non-profit agricultural cooperative which acts as the exclusive sales agent for its members, entered into a contract on behalf of the members for the sale and delivery of pears to THR; the Association did not buy

William J. Bush, Hanson, Bridgett, Marcus, Vlahos & Rudy, San Francisco, Cal., for plaintiffs-appellants.

Jon Craig Gilliland, Murphy, Weir & Butler, San Francisco, Cal., for defendants-appellees.

Before NORRIS, THOMPSON and O'SCANNLAIN, Circuit Judges.

1. Peach grower Whitney Warren died in 1986; the administrators of his estate were substituted as plaintiffs.

the pears from its members. The Association's written contract was orally modified to provide for the same type of deferred-payment schedule from THR as that contained in the tomato growers' contracts.

Part of the Pear Association's contract provided for assignment of processed pears to the Association if THR defaulted on its payments. Thus, in the event of non-payment, the Association would have a security interest in processed pears.

Only one principal here, Whitney Warren, was a peach grower. Warren was a member of the California Canning Peach Association ("Peach Association" or "Association"). His membership agreement with the Peach Association provided for Warren to sell the Association his peaches. The Peach Association, in turn, entered into a multi-year "Contract of Sale to Canner" with THR. Under the contract, THR bought the peaches from the Association.

Unlike the various contracts between THR, on the one hand, and the tomato and pear growers, on the other, the Peach Association's contract did not provide for deferred payments. Rather, under this contract, THR agreed to pay the Association and Warren within seven days of delivery. Despite these contractual terms, Warren had his own demand-payment arrangement with THR: THR would hold the money owed until Warren or his bank requested a partial payment. Like the contract between the pear growers and THR, the Peach Association's contract provided that in the event of THR's non-payment the seller would have a security interest in processed peaches.

On July 9, 1982, THR sought Chapter 11 relief in bankruptcy court. In August and September 1982, after the fifty-percent deferred payments by THR had become due, the tomato and pear growers initiated adversary proceedings in that court, seeking to enforce their producer's liens. The peach grower's adversary proceeding commenced in March 1983.

Defendants in Growers' actions included THR, various banks ("Banks"), which are appellees here, and certain other companies. This last set of companies, known as the "bill-and-hold defendants," had allegedly purchased, or at least contracted to purchase, processed forms of the tomatoes, pears, and peaches from THR but had not yet taken physical delivery as of July 9, 1982. For the most part, THR admitted owing Growers money, but Banks answered that Growers had released their liens by agreeing to the fifty-percent deferred payments.

After the various actions by Growers were consolidated and as discovery slowly proceeded, Banks and other defendants filed motions for summary judgment. On December 30, 1985, the court filed a pre-trial order setting forth certain conclusions of law that would govern the summary judgment motions and the upcoming trials on other issues. This order provided in part:

> The Growers' lien is released, pursuant to Section 55637 of the Producer's Lien Statute, by a deferred payment contract satisfactory to the plaintiff Growers, absent a specific agreement to the contrary.

Pre–Trial Status Conference Order at 3, *California Canning Pear Ass'n v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.)*, Adversary Proceeding No. 282–1254 (Bankr.E.D.Cal.) (Dec. 30, 1985) (Conclusion of Law No. 7). On January 10, 1986, the court indicated that it would enter orders of summary judgment against all plaintiff tomato growers except Newhall, but would defer entry of the judgments until after trials had occurred on the claims on which summary judgment would not be granted.

Trial of the consolidated proceedings was to begin with the pear case in February 1986. One week before trial, Growers entered into settlement agreements with the bill-and-hold defendants. On January 31, the court therefore dismissed all claims and counterclaims between the plaintiffs and the settling defendants.

On February 4, 1986, the first day of trial, Banks moved to dismiss the adversary proceedings under Bankruptcy Rule 7041 on the ground that Growers had violated an order of the court by settling with the bill-and-hold defendants and causing

the court to dismiss those defendants. The court took Banks' motion under submission and trial on the pear growers' claims proceeded. The "tomato trial," limited to Newhall's claim, which was based in part on the argument that Newhall's crossing out of the release-of-lien provision was sufficient to preserve its lien rights, followed in June; the trial on the peach grower's claim took place in July.

On November 24, 1986, the bankruptcy court entered an order granting summary judgment against all of the plaintiff tomato growers except Newhall on the ground that such growers had released their producer's liens as a matter of law by agreeing to one-year deferred-payment arrangements. Two days later, the bankruptcy court entered judgment against Newhall on the basis of the June trial, finding that it, too, had released its producer's liens by agreeing to one-year deferred-payment arrangements.

The bankruptcy court also entered judgment after trial against the pear growers on the ground that they had released their liens by agreeing to a deferred-payment plan. The court found alternatively that ten of the twelve pear growers had released their liens by taking security interests in THR's inventory. The court also entered judgment against plaintiff Warren on the ground that he had released his producer's lien on his peaches by entering into a demand-payment arrangement with THR.

Finally, the bankruptcy court entered orders dismissing, under Bankruptcy Rule 7041 and Rule 41(b) of the Federal Rules of Civil Procedure, the actions against Banks by the tomato and pear growers.

Growers appealed from all of these orders and judgments. In its ruling entered August 31, 1988, the district court discussed specifically only whether Growers released their respective producer's liens as a matter of law by agreeing to a deferred-payment plan. The district court agreed with the bankruptcy court's ruling on this issue and affirmed all of the orders and judgments of the bankruptcy court.

■ Growers timely appealed to this court. Having jurisdiction under 28 U.S.C. § 158(d), we ordered the appeals consolidated.[2]

## II

■ We first consider the district court's conclusion that Growers, by agreeing to a deferred-payment plan for their produce, released their liens as a matter of California law.[3]

## A

■ California law provides that a producer or grower shall have a lien upon "the product" that it sells to a processing company. *See* Cal.Food & Agric.Code §§ 55631–55653 (West 1986 & Supp.1990). The lien attaches to the product upon its delivery to the processor and extends to "all processed or manufactured forms" of the product. *Id.* §§ 55631, 55632. It attaches to the extent of the agreed price or, if there is no agreed price, to the extent of the value of the product on the delivery date. *Id.* § 55631.

**2.** We are in as good a position as the district court to review the findings of the bankruptcy court. *See Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1377 (9th Cir.1985). We note that the bankruptcy court here "engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale." *Sealy, Inc. v. Easy Living, Inc.,* 743 F.2d 1378, 1385 n. 3 (9th Cir.1984). Indeed, the court merely crossed out the word "proposed" in entering the challenged findings. We therefore must review "its findings with special scrutiny." *Id.*

**3.** Whether Growers released their liens in the manner that Banks successfully argued is a question of law. We therefore review *de novo* the lower courts' rulings on this question. *See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We are obligated to construe the producer's lien statute liberally so that it may accomplish its purposes. *See* Cal.Food & Agric.Code § 3 (West 1986); *see, e.g., Saslow v. Andrew (In re Loretto Winery Ltd.),* 898 F.2d 715, 720–21 (9th Cir.1990); *McKee v. Bell–Carter Olive Co.,* 186 Cal.App.3d 1230, 1242, 231 Cal.Rptr. 304, 312 (1986) (producer's lien statute is "remedial and thus entitled to a liberal construction").

At issue here is how a producer may release its lien. The California statutory provision upon which Banks rely provides in its entirety as follows:

> Any lien on any product or processed product may, however, be released, to the extent the value of the claim upon such product is secured, by a surety bond or a cash deposit or other security given as provided in this article. *Any producer may also release any lien* which is possessed by him upon payment being made to him for the agreed or reasonable value of the product which is so sold and delivered, or *upon arrangements being made for such payment which are satisfactory to the producer.*

*Id.* § 55637 (emphases added). The courts below reasoned that the deferred-payment program between the tomato growers and THR was an arrangement for payment that was "satisfactory to the producer." The courts further held that, despite the use of the word "may" in section 55637, release of the lien, where such an arrangement exists, is mandatory. Underlying the holding was the notion that, in the words of the district court, "the producer's lien was designed to ensure that growers are promptly paid and is not intended to secure long-term financing of processors by producers." Memorandum Decision and Order at 10 (Aug. 31, 1988).[4] The district court therefore concluded that "by agreeing to wait a year to be paid one-half of the contract price, the growers released their liens pursuant to section 55637." *Id.* at 12.

We note several difficulties with the reasoning that a grower's agreement to a satisfactory payment plan *ipso facto* releases its producer's lien. First is the wording of section 55637, upon which Banks would rely. California generally distinguishes, in constructing and in construing its statutes, between "shall" and "may," regarding the former as indicating a mandatory act and the latter merely a permitted one. *See,*

*e.g., Common Cause v. Board of Supervisors,* 49 Cal.3d 432, 443, 777 P.2d 610, 616, 261 Cal.Rptr. 574, 580 (1989); *Hofacker v. Board of Supervisors,* 264 Cal.App.2d 290, 293, 70 Cal.Rptr. 374, 376 (1968). More particularly, the Food and Agricultural Code itself defines "may," as used in the Code, to be "permissive." *See* Cal.Food & Agric.Code § 47 (West 1986).

We are therefore inclined to construe the statement in section 55637 that "[a]ny producer may . . . release any lien . . . upon arrangements being made for . . . payment which are satisfactory to the producer" as indicating permissive release. We agree with Banks, however, that the statute is ambiguous. We therefore look to legislative history behind the producer's lien and to the statutory scheme.

**B**

Banks' interpretation of section 55637 is not aided by legislative history. The producer's lien statute was amended in 1979 by the deletion of, *inter alia,* a provision in section 55635 that the lien would "remain in effect for 60 days" after its completion and then "cease" unless the producer filed suit within that time to enforce the lien. Growers point to the deletion of this provision as an indication that the legislature intended to eliminate any statutory limitation on the lien's life.

Growers' argument is strongly supported by both a reading of the producer's lien statute and the legislative history of the 1979 amendment. A California Senate Committee on the Judiciary report on the proposed amendment in 1979 stated that the bill "would (1) eliminate the 60-day limitation on producer's liens and (2) delete the provisions of existing law which preclude a producer's lien on farm products pledged by the processor to a lender." Cal. Sen.Comm. on Judiciary, Analysis of A.B. 774, 1979–80 Sess., at 1 (as amended Aug.

---

**4.** All references to proceedings in the district court here are to *Alvernaz Farms, Inc. v. Bank of California (In re T.H. Richards Processing Co.),* Civil Nos. S–87–0049 MLS, S–87–0051 MLS, S–87–0052 MLS (E.D.Cal.). Unless otherwise indicated, all references to proceedings in the bank-

ruptcy court are to *Alvernaz Farms, Inc. v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.),* Consolidated Adversary Proceedings Nos. 282–1253, 282–1254, 282–1487, 283–0562 (Bankr.E.D.Cal.).

20, 1979) (original on file in California State Archives). The analysis merits extensive quotation:

> Proponents assert that a 60–day lien period is inadequate given the untimeliness of payments which have historically plagued the agricultural industry. Often, a grower may not know that the processor is in financial straits until long past the 60 day period.
>
> .... Growers stand more or less defenseless when the processor pledges away the grower's pack, since the only thing of value that they possess to insure getting paid is their product.
>
> Lenders, on the other hand, can seek security interests in other assets held by the processor, i.e., real property, machinery and equipment, furniture and other fixtures. Should a processor default on a bank loan, the bank does not face financial ruin, as the grower might.
>
> ....
>
> .... The latest version of the bill would give growers a priority lien on their product, although any of such product in excess of the amount necessary to satisfy the total amount owed to growers under contract would be free and clear of the lien. Thus, bankers would still be able to lend to canners on their inventory when the value of the inventory exceeded the total amount of liens.
>
> In addition, existing Food and Agricultural Code Sec. 55638 prohibits a processor from removing or selling any farm product delivered to him upon which a lien attaches, except any of that product as may be in excess of inventory on hand which has a value sufficient to satisfy all existing liens.
>
> ....
>
> [Under the new version, the processor will be able to sell product even when he does not have enough other product on hand to satisfy the liens,] *so long as the total proceeds from such sale are used to satisfy obligations to growers which are secured by lien.*

*Id.* at 2–4 (emphasis added); *see also* Note, *The California Agricultural Producer's Lien, Processing Company Insolvencies, and Federal Bankruptcy Law: An Evaluation and Alternative Methods of Protecting Farmers,* 36 Hastings L.J. 609, 613 & nn. 40–43 (1985) (noting that the 1979 amendment was made "because a significant number of deferred payment contracts provided for final payment *as long as a year* after delivery of the farm products to the processor") (emphasis added). This Committee Analysis strongly supports the conclusion that the mere existence of a satisfactory payment arrangement does not *ipso facto* release a producer's lien.

## C

Nor does the statutory scheme contain much that commends Banks' interpretation of section 55637. The provision states that a producer "may ... release" its lien "upon arrangements being made for ... payment which are satisfactory to the producer." Cal.Food & Agric.Code § 55637 (West 1986). As even the district court conceded, "[i]t would seem that in *every* transaction, there are 'arrangements being made for ... payment which are satisfactory to the producer,' and if 'may' is read as 'shall', appellants' point that the lien would be a nullity is well taken." Memorandum Decision and Order at 12 (Aug. 31, 1988) (emphasis in original).

Indeed, if the mere existence of a satisfactory payment arrangement automatically causes the release of a producer's lien, then the lien will exist only very rarely. The producer will have a lien perhaps only in two situations: where there is delivery either without agreement as to price or without agreement as to time of payment. Certainly it will not have a lien, under Banks' view, when it and the processor have entered into a contract covering the basic details of payment (e.g., time and amount). Yet this seems inconsistent with section 55631 of the statute, which provides that "the lien shall be to the extent of the agreed price, if any, for such product so sold." Cal.Food & Agric.Code § 55631 (West 1986). Under Banks' construction, the lien would exist only in the less than frequent cases where producer and processor have not agreed on time or manner of payment; agreement as to price and

time would release a lien. Such a construction, if adopted, would permit the release-of-lien provision to swallow the lien; the lien might not be a nullity *de jure*, but would be *de facto*.

Contrary to Banks' urgings, this crabbed construction of the producer's lien does not comport well with the statute's structure. For instance, the lien attaches not only to the product but to all "processed or manufactured forms" of the product. *Id.* Yet by the time that produce is delivered, processed, and transformed (for example, from tomatoes into catsup), payment arrangements (and often payment itself) almost certainly would have been made and the lien, under Banks' view, would have been released. Yet the producer's lien statute contains a comprehensive scheme whereby growers may file suit to enforce their liens when processors have defaulted on *agreed-to* payments. *See, e.g., id.* § 55636.

In addition to section 55636, other sections of the producer's lien statute would also be rendered largely superfluous under Banks' construction. This is especially true of section 55639, which sets forth five ways that a producer's lien may be released. Perhaps because it is so crucial, section 55639 is the most detailed part of California's lien law. We reproduce the section in full so that there may be no gainsaying its comprehensiveness:

§ 55639. Release; methods

Any processor that desires to secure a release of any or all of such liens on any product or processed product may do so in any of the following ways:

(a) By paying the agreed or actual value of any farm product which is purchased by such processor within 20 days from the date of delivery of the farm product unless the date of payment is otherwise agreed upon in writing or such payment is secured other than by lien.

(b) By depositing with the director [of Food and Agriculture] a surety bond which is executed by such processor as principal and by a surety company which is qualified and authorized to do business in this state as surety in an amount which equals the current market value of the product or processed product which is intended by such processor to be sold or otherwise disposed of, as such value may appear by the sworn statement of such processor in accordance with quotations from the federal-state market news service or other evidence which is satisfactory to the director. The bond shall be conditioned that if the processor fails to pay up to the amount of such bond the lawful claims of all producers whose liens have been released by the bond, within 35 days after the date of the bond, the surety shall be liable to and shall pay to the state on behalf of such claimants all such lawful claims as may be covered by the amount of the bond, together with costs of suit if an action is filed on the bond.

(c) By depositing with the director a cash sum in lawful money of the United States which is expressly set apart by an instrument in writing that is signed by the processor for the purpose of guaranteeing to the extent of such sum, payment of all existing claims of producers whose liens are released by the deposit, within 35 days from the date of such deposit. The director shall be named in such instrument as trustee to carry out the purpose and intent of the instrument.

(d) By designating, setting apart, and depositing in a public warehouse a quantity of any processed farm products and indorsing over to the director and delivering to him the warehouse receipt for such products for the purpose of guaranteeing to the extent of the value of such deposit, payment within 35 days from the date of such deposit, all existing claims of producers and labor claimants whose liens are released by it.

(e) By securing a release from the director after payment in full for such farm product.

*Id.* § 55639. It would be most unwise to graft onto the producer's lien statute another method of release that would render nugatory so many of the statute's express

provisions.[5]

### D

■ In short, we must overturn the district court's conclusion that a producer who agrees to deferred-payment arrangements for the purchase of its produce releases its lien as a matter of law. For the reasons set forth above, such conclusion is contrary to the language of the producer's lien statute, the statute's structure and purposes, and its legislative history. For these same reasons, peach grower Warren did not release his lien by agreeing to a demand-payment program.

We make no determination, however, as to whether Growers otherwise released their liens. For instance, Banks contend that most of the tomato growers released their liens by signing a contract one of whose provisions was entitled "Release of Producer's Lien" and included the statement that the payment arrangements were "satisfactory to GROWER." *E.g.*, 1981 Tomato Contract, *reprinted in* Plaintiffs' and Banks' Agreed Statement of Facts, Exhibit D (Apr. 29, 1985). We do not reach this issue because neither the bankruptcy court

nor the district court ever found that these growers had so released their liens. Nor do we address appellants' contention that they did not understand the sections of the contracts which purported to effect a release of their liens, or their argument that waiver analysis applies to resolution of such a contention.

We note, however, that, contrary to Banks' assertions, Growers are not precluded from arguing on remand that the "Release of Producer's Lien" section in certain contracts is invalid. On the issue of whether Growers had released their liens, Banks argued in the bankruptcy court that Growers' agreements to deferred-payment and demand-payment arrangements *automatically*—as a matter of law—operated to release their liens. *See, e.g.*, Notice of Motion and Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Issues (dated April 30, 1985); *see also* Memorandum of Points and Authorities in Support of Banks' Motion for Summary Judgment or Summary Adjudication of Issues at 12–18 (filed Apr. 29, 1985) (arguing that "[t]he lien was thus released

---

**5.** Banks also inaccurately characterize the interrelationship of section 55637 and section 55638. Section 55638 places certain restrictions on a processor's movement or marketing of its inventory so long as the inventory is subject to a producer's lien. Such a processor may "remove, from this state [i.e., California] or beyond his ownership or control, any farm product which is delivered to him, or any processed form of the farm product, to which any of the liens provided for in this chapter has attached" only if certain conditions are met. Cal.Food & Agric.Code § 55638 (West 1986). Banks contend that "[t]his section compels a finding that the producer's lien simply does not work in a case where the producer has agreed to long term payment arrangements of a year or more." Appellees' Brief at 19–20.

It is unnecessary to determine why Banks think that the producer's lien ceases to exist in this context exactly one year after delivery, for section 55638 compels no such conclusion. The statute itself refutes Banks' contention. A processor may remove "any of such product or processed product as may be in excess of a quantity on hand which is of a value that is sufficient to satisfy all existing liens." Cal.Food & Agric.Code § 55638 (West 1986). Banks argue that to allow a lien to remain on produce until payment for it has been made would, in

the case of deferred payments, require a processor to store an ever-changing quantity of canned goods to satisfy existing liens. Yet Banks concede, as they must, that sales of goods subject to the producer's lien are permissible under section 55638 when the proceeds from such sales are used, to the extent necessary, to satisfy the obligations secured by the lien. *See id.* ("[T]his section shall not prohibit the sale of any farm product or processed form of the product to which such a lien has attached so long as the total proceeds of the sale are used to satisfy obligations to producers which are secured by a lien established pursuant to this chapter.").

Banks contend that our interpretation of section 55637, coupled with the restrictions on movement and marketing that section 55638 contains, would compel processors to pay producers prior to the time specified in any contractual arrangements. As Growers point out, however, nothing would prevent processors from depositing the funds from a sale of product in an appropriate account and then effecting payment without interest at the contractually set date. *See also id.* § 55639 (detailing other means whereby a processor may secure a release of lien without immediately paying producers). The wisdom of proceeding in such a manner is demonstrated by the fate of THR and this subsequent litigation.

by operation of law, whether or not the producer signed or understood the express release provision set forth at the end of the applicable grower contract" and citing to the much-discussed section 55637 of the Food and Agricultural Code for this erroneous proposition). Our decision rejects that argument.

### III

We turn next to the question of whether Growers are in large part precluded from recovering the payments due them under their contracts with THR because of their failure to marshal their liens. The bankruptcy court ruled that marshaling was appropriate in this case and that Banks had filed a timely demand that Growers marshal. The court concluded that because of their refusal to marshal, their subsequent settlement with the bill-and-hold defendants, and their release of that inventory, Growers must be charged with the $5,800,-000 value of the inventory. The district court affirmed this determination. We reverse.[6]

The doctrine of marshaling is controlled here by California law. *See Victor Gruen Associates, Inc. v. Glass*, 338 F.2d 826, 829 (9th Cir.1964). Section 2899 of the California Civil Code provides that "[w]here one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort" first to the security held exclusively by him. Cal.Civ.Code § 2899 (West 1974); *see also* Cal.Civ.Code § 3433 (West 1970) (governing marshaling with respect to com-

peting creditors' claims generally and providing similarly); *Glass*, 338 F.2d at 829 (describing marshaling). "Marshaling is not bottomed on the law of contracts or liens.... [but] in equity.... Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963); *cf.* Cal.Civ.Code § 3514 (West 1970) ("One must so use his own rights as not to infringe upon the rights of another."). It is the applicability of marshaling to this dispute, not its underlying mechanics, that is at issue here.

Central to the bankruptcy court's determination that marshaling was implicated in the instant controversy was its finding that there were two sets of inventory of THR's products. One was "bill-and-hold" inventory. A bill-and-hold customer was "one who had by July 9, 1982 purchased or agreed to purchase a specified number of cases of product from THR and had been invoiced for that product," but whose product was "still in the possession of THR awaiting receipt of shipping instructions." Findings of Fact and Conclusions of Law at 19, *California Canning Pear Ass'n v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.)*, Adversary Proceeding No. 282–1254 (Bankr.E.D.Cal.) (Nov. 24, 1986) [hereinafter "Findings and Conclusions"]. The second set of inventory was held as of July 9, 1982 (the date on which THR filed for Chapter 11 reorganization) by a field warehouseman, Lawrence Warehouse Systems, Inc. ("Lawrence"). This latter set consisted of 632,852 cans of fruit

---

**6.** We reject Banks' contention that no question other than whether Growers released their liens is before us. Growers appealed to the district court from numerous orders and judgments of the bankruptcy court. Although the district court discussed only what it considered the central question of whether Growers released their liens as a matter of law by agreeing to deferred payments, it specifically indicated that "[t]he orders and judgments appealed from are AFFIRMED." Memorandum Decision and Order at 12 (Aug. 31, 1988). From this ruling affirming the bankruptcy court's orders and judgments, Growers have appealed to us.

We disagree with Banks' assessment that the district court decided only the issue that it discussed at length. If mere absence of accompanying analysis rendered a district court's order or judgment non-appealable, our docket would be reduced considerably. A district court, however, need not always act with accompanying discussion for its action to be legally effective. Here, the dispositive fact is that the district court affirmed all the orders and judgments of the bankruptcy court from which Growers had appealed.

and tomato product. Lawrence held this inventory under a non-negotiable warehouse receipt issued to Banks.

Because it is not contested that all the other prerequisites for the application of marshaling were met here, the correctness of the bankruptcy court's ruling turns on which parties, as among Banks and Growers, had interests in which inventories. If Growers had an interest in both inventories and Banks had an interest only in the warehouse inventory held by Lawrence, marshaling was applicable; if both sets of parties had interests in both inventories, marshaling was inapplicable. *See* Cal.Civ.Code §§ 2899, 3433 (West 1970 & 1974).

■ We agree with the bankruptcy court's finding that both the bill-and-hold and the warehouse inventories "were subject to, and [therefore] available to satisfy, Plaintiffs' statutory lien claims." Findings and Conclusions at 37; *accord* Findings of Fact and Conclusions of Law at 20, *Alvernaz Farms, Inc. v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.)*, Adversary Proceeding No. 282–1253 (Bankr.E.D.Cal.) (Nov. 24, 1986). This finding was based in part on the court's pre-trial ruling that "the transfer of possession [of produce] to a field warehouseman is not a sufficient transfer of possession to defeat a producer's lien." Findings and Conclusions at 37. We have no difficulty with that conclusion of law. *See* Cal. Food & Agric.Code § 55634 (West Supp.1990) ("Every lien which is provided for in this article is on every farm product and processed form of the farm product which is in the possession of the processor without segregation of the product.").

■ We disagree, however, with the bankruptcy court's implicit conclusion that Banks had no interest in the bill-and-hold

inventory.[7] Its sole apparent rationale for so concluding was that "evidence introduced at trial showed that much of the bill-and-hold inventory had not been paid for." Findings and Conclusions at 37. We are at a loss to understand how the lack of such payment translates into a conclusion that Banks had no interest in this inventory. Surely the bankruptcy court could not have meant that if the bill-and-hold inventory had been paid for, Banks would have had an interest in the payments and therefore marshaling would have been inapplicable.

Indeed, the evidence tends to establish the *opposite* of the bankruptcy court's unspoken finding; both Growers *and* Banks seem to have had an interest in both the warehouse inventory *and* the bill-and-hold inventory. For instance, Banks filed in 1979 a UCC–1 Financing Statement describing their security interest as including "all inventory …, all accounts, chattel paper, … and rights to payment of every kind now or hereafter arising in favor of Debtor out of Debtor's business." Plaintiffs' and Banks' Agreed Statement of Facts, Exhibit A (Apr. 29, 1985). This seems to indicate that Banks indeed had an interest in the bill-and-hold inventory and in any proceeds from its sale.

In short, the bankruptcy court erred in concluding that Banks had an interest in only one of the two sets of inventory. The only evidence cited by the court (*viz.,* the fact that the bill-and-hold inventory was largely unpaid for) does not bear upon the question of whether Banks had an interest in that inventory. Moreover, relevant evidence, such as the above-quoted financing statement, indicates that Banks had an interest in all inventory.

---

**7.** The bankruptcy court never expressly found that Banks had no interest in the bill-and-hold inventory or less of an interest than that which Growers had. It implicitly so found, however, by concluding that marshaling was implicated, for if Banks and Growers had equivalent interests in both inventories, Growers were not required by the equitable doctrine of marshaling first to resort to a particular inventory. The lack of an explicit finding might well have been

avoided if the bankruptcy court had not adopted findings drafted by Banks. *See supra* note 2.

We note that on appeal Banks argue that they had no interest at all in the bill-and-hold inventory, not merely that they had less of such an interest than Growers. Because the bankruptcy court adopted Banks' proposed Findings and Conclusions, we here assume that the court agreed with that argument.

Because we reject the bankruptcy court's conclusion that Banks had an interest in only one set of inventory, we also overturn its conclusion that marshaling was applicable here. Growers were under no duty to marshal their liens. The bankruptcy court therefore erred in determining that Growers should be credited with receiving some $5,800,000 (the value of the bill-and-hold inventory to which Growers released their claims in a settlement).

## IV

Finally, we turn to the question of whether the bankruptcy court erred in dismissing the tomato and pear growers' actions under Bankruptcy Rule 7041.[8] This rule imports Federal Rule of Civil Procedure 41 into adversary proceedings in bankruptcy and allows for involuntary dismissal of an action "for failure of the plaintiff . . . to comply with these rules or any order of court." Fed.R.Civ.P. 41(b). We conclude, for the reasons set forth below, that the bankruptcy court erred, and we therefore reverse the orders of dismissal.[9]

The bankruptcy court entered its identical orders of involuntary dismissal on November 26, 1986, two days after it handed down most of its findings of fact and conclusions of law in the consolidated cases. The orders themselves, whose texts run barely 100 words, offer little explanation of their underlying grounds; they do not specify which "order of court" Growers had failed "to comply with." *Id.* The court indicated that it was granting the motion "upon examination of the [Banks'] Declarations and Memorandum of Points and Authorities filed in support thereof and good cause appearing therefor." Order Granting Motion to Dismiss of Defendants The Bank of California, N.A., Security Pacific National Bank and Harris Trust and Savings Bank, at 2, *Alvernaz Farms, Inc. v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.)*, Adversary Proceeding No. 282-1253 (Bankr.E.D.Cal.)

**8.** There is no question that this ruling is properly before us on appeal. *See supra* note 6.

**9.** Our review of a dismissal under Rule 41(b) is for abuse of discretion. *See, e.g., Nealey v.*

(Nov. 26, 1986) (identical order filed in Adversary Proceeding No. 282-1254). The bankruptcy court offered no other articulation in connection with these orders of involuntary dismissal.

Banks had moved for involuntary dismissal of the tomato and pear growers' actions on February 4, 1986. This was the day on which the first trial in the consolidated tomato, pear, and peach actions was scheduled to commence. According to Banks, the action prompting the motion was a settlement between Growers and the bill-and-hold defendants. On January 30, 1986, the bankruptcy court held a hearing at which a proposed settlement between Growers and the bill-and-hold defendants was presented. Because Banks had not received copies of the settlement documents, and even though they were not parties to this contemplated settlement, Banks persuaded the court that they should be provided an opportunity to review the settlement proposal prior to the trials. Near the end of the January 30 hearing, the bankruptcy court made the following statement:

> Well, *go ahead and settle,* and we'll all try to be gentlemen together. And if we have to put the trial over to '88, we'll do it. . . . [A] lot of this is supposition. The banks haven't had an opportunity to reconsider this matter that's come up. *It sounds to me like it's perfectly proper. If people want to settle, they can settle.* But I think it's perfectly proper that *the other side*—since this will make quite a bit of difference in their method of procedure—*should have an opportunity to think about it and change whatever positions are necessary.*
>
> . . . .
>
> I don't know how we can hear, without a crystal ball, though, all these problems. I'm going to continue everything in this case that's feasible to the human mind to 10:00 o'clock on Tuesday, February 4th.

*Transportacion Martima Mexicana, S.A.,* 662 F.2d 1275, 1278 (9th Cir.1980). Again, special scrutiny is necessary in this instance. *See supra* note 2.

And whatever problems there are, we'll meet them.

Reporter's Transcript of Proceedings, Jan. 30, 1986, at 23, 28 (emphases added). Banks contend that the "clear import of [this] ruling" was violated on January 31 when the bankruptcy court entered orders "dismissing the Bill and Hold Defendants prior to a full hearing on the proposed settlement." Appellees' Brief at 37; *see also* Memorandum of Points and Authorities in Support of Motion to Dismiss, *Alvernaz Farms, Inc. v. T.H. Richards Processing Co. (In re T.H. Richards Processing Co.)*, Adversary Proceedings Nos. 282–1253, 282–1254 (Bankr.E.D.Cal.) (dated Feb. 3, 1986) (arguing same) (cited by bankruptcy court in orders of dismissal).

We reject these arguments by Banks and conclude that the bankruptcy court clearly abused its discretion in ordering involuntary dismissals of Growers' actions based on such arguments. Most fundamentally, Growers violated no "order of court," Fed. R.Civ.P. 41(b), by submitting the stipulations and proposed orders to dismiss the bill-and-hold defendants. Such an action certainly did not run counter to the above-quoted statement of the bankruptcy court, to which Banks point, for the bankruptcy court there never indicated that it was prohibiting the submission of any proposed settlement. Indeed, the bankruptcy court stated that it was willing to approve settlements, so long as all parties had notice of any such settlement. We find entirely meritless Banks' argument that the court's statement was an order that Growers somehow violated by submitting proposed settlements.

Nor did Growers violate the Federal Rules of Civil Procedure. *See id.* (authorizing involuntary dismissal not only when a plaintiff fails to comply with an order of court but also when he fails "to comply with these rules"). We cannot countenance Banks' argument that Growers violated the express provisions of Rule 41(a)(1) or the implicit standards of Rule 41(a)(2). As to the former, Banks either fail to understand or choose to ignore that the rule is inapplicable. Whereas it applies to actions "dismissed by the plaintiff *without order of court*," Fed.R.Civ.P. 41(a)(1) (emphasis added), the dismissal of the bill-and-hold defendants here was ordered by the court. As to the latter, Growers have violated neither the express provisions nor the implicit standards of Rule 41(a)(2). In fact, Growers specifically complied with this rule, which governs actions "dismissed at the plaintiff's instance ... upon order of the court and upon such terms and conditions as the court deems proper." Fed.R. Civ.P. 41(a)(2). The bankruptcy court entered the orders of dismissal of the bill-and-hold defendants, for which Growers had moved, consistently with this rule.[10]

## V

The cases are remanded for proceedings consistent with this opinion. Any issues upon which we have not ruled may be considered in the bankruptcy and district

---

**10.** We also reject Banks' argument that involuntary dismissal of Growers' action was proper because, previous to entering into a settlement with the bill-and-hold defendants and moving for dismissal of those defendants, Growers had argued "that the Bill and Hold Defendants were essential to a full adjudication of the issues." Appellees' Brief at 35. Banks misconstrue Growers' argument; Growers had contended only that the bill-and-hold defendants were "necessary" within the context of section 55653 of the California Food and Agricultural Code. This section allows joinder of any party "necessary to a determination of [an] action" concerning producer's liens; it does not purport to allow dismissal for non-joinder. *See* Cal.Food & Agric.Code § 55653 (West 1986). The provi-

sion is designed to enable growers, who are attempting to enforce their liens against a processor, to join as defendants any other parties who might also claim an interest in the processor's inventory. Once a settlement was reached with the bill-and-hold defendants, however, they were scarcely necessary parties to a determination of Growers' lien claims. It would be anomalous indeed to interpret section 55653 as prohibiting producers from settling with those who may or may not have competing claims. To borrow Growers' astute words, "the right to join a person as a party to an action does not deprive one of settling with that party while proceeding to trial against remaining non-settling defendants." Appellants' Reply Brief at 24.

**652**

courts as appropriate.[11]

REVERSED AND REMANDED.

---

**11.** For instance, we do not reach the question whether the district court erred in affirming the bankruptcy court's ruling that Banks were entitled to a $2,300,000 credit for cash collateral consumed by the debtor THR. We also do not address Growers' contention that they are entitled to interest on any money owed them; because Growers have yet to receive any judgment in their favor, the issue is not reviewable.